1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   RICHARD EMMETT WARD,              No. CIV S-05-0817-GEB-CMK-P

12            Petitioner,

13      vs.                            <u>FINDINGS AND RECOMMENDATIONS</u>

14   D.L. RUNNELS,

15            Respondent.

16   _____/

17            Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court is petitioner's petition for

19   a writ of habeas corpus (Doc. 1), filed on April 26, 2005, and respondent's answer (Doc. 6), filed

20   on August 11, 2005.[1]

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26      [1]      Pursuant to the court's September 22, 2005, order, petitioner's traverse is
     disregarded.

# I. BACKGROUND

A.   **Facts**[2]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> On March 21, 2001, sisters Michelle Coleman and Eva Jacobs, along with three children, lived in a two-bedroom duplex on the cul-de-sac end of Libra Avenue in Sacramento County.  That evening, Coleman and Jacobs went to the Cordova Inn nightclub in Rancho Cordova.  They were joined by Jacobs' boyfriend, Emory Jackson.  Coleman's brother-in-law, Joe Johnson, babysat the children at the duplex.
>
> At the club, both Coleman and Jacobs consumed alcohol.  Coleman became drunk.  While there, Jacobs saw defendant, whom she had met when she was 15.  They embraced, exchanged greetings, and had a friendly conversation.
>
> At approximately 2:00 a.m., Jacobs and Jackson left the club in Jackson's Chevy Impala.  Jackson drove the back streets because he had been drinking and did not want to be pulled over.  He was the subject of an outstanding warrant.  While they were stopped at a stop sign, a dark green or purple car pulled up along the driver's side of their car.  Jacobs saw someone from the other car fire a gun in their direction.  She ducked down for a while, then raised her head and saw the dark car drive away.  It was followed by a Cadillac, which Jacobs described as white and an older model.  Jackson and Jacobs then drove to the duplex, arriving at approximately 2:15 a.m.
>
> Meanwhile, shortly after Jackson and Jacobs left the club, Coleman left the club with Mark Bluster, a man she had met that evening.  He drove them to the duplex, where they parked the car and chatted.  While there, Coleman observed a silver or gray new model car drive around the cul-de-sac.  The car had its high beam headlights on, but its tail lights and back license plate light were off.  This gave Coleman a bad feeling about the car.  Felling uncomfortable outside, Coleman went inside the duplex and asked Jacobs if she could bring Bluster in.  Jacobs refused as she did not want strangers in the house.  Coleman then decided to go to a motel, and retrieved $40 from her bedroom.
>
> As Coleman left the house, Jacobs heard a car pull up.  She did not see headlights reflected off her window blinds as she normally did when a car turned around in the cul-de-sac.  She asked Jackson to look out the window.  He did, and saw the same car from which someone had shot at him and Jacobs earlier that night.  Jackson called 911 while Jacobs woke up Johnson and told him to get out of the house.  Jackson and Jacobs then

---

[2]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

left the house with one of the children, Jacobs' daughter, and hid in a neighbor's shed.  Jacobs called the police from there.

Meanwhile, after Coleman left the duplex and got back into Bluster's car, someone immediately pulled her coat over her head and dragged her out of the car and towards the duplex, hitting her along the way with what felt to Coleman to be a pistol.  Because her house key opened only one of the two locks on the door, the man dragging her kicked the door open.  He put Coleman face-down on a mattress in the living room and put a gun to her head.  Bluster was lying on the mattress beside her, and was being hit.  He was forced to remove his clothes and his jewelry.  Coleman was forced to pull down her pants, insert her finger into her vagina, and massage it.

Coleman thought there were several people in the house.  She heard three or four different voices.  She cried about her babies, and a man told her he would not hurt them.

After being awakened by Jacobs, Johnson put the two remaining children into the bedroom corner.  As he left the bedroom but before he was able to close the door, he was met by four men.  One of them stuck a gun into the side of his neck.  The men were all wearing black masks, large black jackets, gloves, dark jeans, and dark boots.

The man holding the gun to Johnson asked where he could find money, jewelry, and keys to the car parked in front.  Johnson told him he did not know because it was not his house.  The man then ordered Johnson to lie on the floor.  Johnson heard the men rifling through the house and the garage.  Someone found some money in Coleman's room, and asked Johnson where was the rest of the money.  He replied that he did not know.  A man stepped on Johnson while he was lying on the floor; another struck him on the head.

Johnson described the gun pulled on him as similar to a Beretta or a nine-millimeter automatic handgun, a type of gun owned by his father.  Johnson also noticed another man held a gun that resembled a police officer's gun.  After a few minutes, he heard someone whistle from the front of the house, and the men left, telling the victims not to get up.

Ultimately, Coleman got up and found the house in a mess.  She discovered approximately $400 was missing from her bedroom dresser drawer.  Her keys had also been taken.  Coleman could not remember the denominations of the money taken from her: "I think it was some 20s and some different ones, probably – oh, I don't remember."

At approximately 3:00 a.m., sheriff's deputies were dispatched to the duplex.  The officers were informed the suspects might be in a newer silver Cadillac.  As she approached the house with her headlights off, Deputy Kristina Albright observed a newer silver Cadillac come out of the court on Libra Avenue.  Albright turned on her headlights and followed the car.  She had difficulty determining how many people were in the car, but she noticed someone in the car besides the driver was trying to duck down.

Two additional deputies followed Albright's car.  One deputy, Robert Rinelli, observed the Cadillac's driver was a light-skinned Black male.  The driver's passenger was darker-skinned, and was wearing a dark knit ski-type cap and all dark clothing.

3

1
2
Albright activated her overhead lights, and the Cadillac accelerated.  Then it stopped abruptly in the street.  The passenger door opened, and a Black male ran from the car.  He was wearing a black jacket, black pants, black gloves, and a black stocking cap.

3
4
5
6
Deputies took the driver – defendant – into custody without incident.  Defendant wore a red and black coat, a white tank top, black shorts, and black shoes.  Deputies found $435 in cash wadded up inside defendant's pants pocket, and a wallet in another pants pocket.  The money found in defendant's pocket consisted of four $100 bills, one $20 bill, two $5 bills, three $1 bills, and two silver dollars.  Deputies also found a loaded nine-millimeter Beretta about five to ten feet away from the Cadillac's opened passenger door.

7
8
9
Minutes later, the deputies located co-defendant John-Charles hiding in a garbage can in the neighborhood.  With him, deputies found a black jacket, black sweatshirt, black stocking cap, and a black glove.  John-Charles was positively identified as the person who ran from the Cadillac driven by defendant.

10
11
12
Coleman identified the stopped Cadillac as the same car she saw that night driving on the cul-de-sac with its taillights off before she went into the house.  Inside the Cadillac, deputies located a duffel bag with stereo equipment inside.  Jacobs later identified the equipment as belonging to her.

13    **B.    Procedural History**

14    Petitioner and co-defendant Curtis Michael John-Charles were charged with:

15    (1) two counts of robbery, in violation of California Penal Code § 211; (2) one count of receiving

16    stolen property, in violation of California Penal Code § 496(a); and (3) one count of assault with

17    a firearm, in violation of California Penal Code § 245(a)(2).  Following a jury trial, petitioner

18    was convicted on all charges.  The jury also found true the charges that petitioner acted in

19    concert with three or more people, in violation of California Penal Code § 213(a)(1)(A), and that

20    a principal was armed with a firearm in the commssion of the offenses, in violation of California

21    Penal Code § 12022.53(b).  The trial court found true the allegation that petitioner had two or

22    more prior serious felony convictions.  Petitioner was sentenced to an aggregate term of 82 years

23    to life, consisting of three consecutive 25-year to life sentences, plus seven years enhancements.

24    The trial court stayed a 25-life sentence on one of the counts.  Petitioner's conviction and

25    sentence were affirmed by the California Court of Appeal and the California Supreme Court

26    denied direct review.  Petitioner did not file any state habeas actions.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

1          Under § 2254(d), federal habeas relief is available where the state court's decision

2   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

3   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

4   Court), the United States Supreme Court explained these different standards.  A state court

5   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the

6   Supreme Court on the same question of law, or if the state court decides the case differently than

7   the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

8   court decision is also "contrary to" established law if it applies a rule which contradicts the

9   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

10  that Supreme Court precedent requires a contrary outcome because the state court applied the

11  wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

12  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

13  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

14  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

15  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

16  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

17  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

18          State court decisions are reviewed under the far more deferential "unreasonable

19  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

21  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

22  suggested that federal habeas relief may be available under this standard where the state court

23  either unreasonably extends a legal principle to a new context where it should not apply, or

24  unreasonably refused to extend that principle to a new context where it should apply.  See

25  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26  decision is not an "unreasonable application of" controlling law simply because it is an

1  erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,

2  123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot

3  necessarily be found even where the federal habeas court concludes that the state court decision

4  is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear

5  error fails to give proper deference to state courts by conflating error (even clear error) with

6  unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

7  law, where a state court decision is an "unreasonable application of" controlling law, federal

8  habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

9  283 F.3d at 1052 n.6.

10          The "unreasonable application of" standard also applies where the state court

11  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

12  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

13  are considered adjudications on the merits and are, therefore, entitled to deference under the

14  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

15  The federal habeas court assumes that state court applied the correct law and analyzes whether

16  the state court's summary denial was based on an objectively unreasonable application of that

17  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

18

19                              **III.  DISCUSSION**

20          In his pro se petition, petitioner raises the following claims:

21          1.      The trial court erred in failing to instruct the jury that it could not find
                    petitioner guilty as an aider and abettor of a crime that was committed
22                  before petitioner became an accomplice;

23          2.      Trial counsel was ineffective in failing to request an aiding and abetting
                    instruction that the requisite act, knowledge, and intent must precede or
24                  coincide with the offense, and that a late joiner is not criminally
                    responsible for crimes committed before he joined;

25

26  ///

3.     The prosecutor committed misconduct in closing argument and the trial / court erred in making statements to the jury during closing argument, resulting in an unfair trial;

4.     Trial court erred by not inquiring further into petitioner's request for a new attorney to represent him in his motion for a new trial;

5.     Petitioner's sentence of 82 years to life in prison constitutes cruel and unusual punishment;

6.     The trial court abused its discretion in refusing to strike one of petitioner's prior convictions;

7.     Even if the trial court did not abuse its discretion in failing to strike a prior serious felony conviction as to all of the counts, it did abuse its discretion in failing to strike a prior serious felony allegation as to two of the counts and/or in imposing consecutive sentences; and

8.     Assuming that sentencing issues were waived, defense counsel was ineffective in failing to object to petitioner's sentence on the grounds that it constitutes cruel and unusual punishment and to request that the court sentence petitioner concurrently and/or dismiss a prior serious felony conviction allegation as to some counts.

Respondent concedes that these claims are exhausted.

### A.     Aiding and Abetting Instruction (Claim 1)

The state court summarized petitioner's claim as follows:

> Defendant contends the trial court committed prejudicial error when it failed to instruct sua sponte on the timing of defendant's involvement in the crimes. Specifically, he claims the prosecutor presented a possible theory that defendant did not join the criminal enterprise until co-defendant John-Charles got into defendant's car with the stolen property. Thus, he argues the court should have instructed the jury it could not find defendant guilty of robbing Bluster and assaulting Johnson if the jury concluded defendant's participation began after those two crimes were committed and consisted only of letting co-defendant John-Charles in his car and driving him away.

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright,

1    786 F.2d 1378, 1381 (9th Cir. 1986).  Thus, a challenge to jury instructions does not generally

2    give rise to a federal constitutional claim.  See Middleton, 768 F.2d at 1085) (citing Engle v.

3    Isaac, 456 U.S. 107, 119 (1982)).

4            However, a "claim of error based upon a right not specifically guaranteed by the

5    Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

6    infects the entire trial that the resulting conviction violates the defendant's right to due process."

7    Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

8    Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

9    claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

10   miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

11   F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

12           In general, to warrant federal habeas relief, a challenged jury instruction "cannot

13   be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

14   process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

15   (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

16   must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

17   conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

18   414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury

19   instructions "'in the context of the overall charge to the jury as a component of the entire trial

20   process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

21   1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

22   'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

23   way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

24   U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

25   instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

26   / / /

1    It is well-established that the burden is on the prosecution to prove each and every

2  element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

3  (1970).  Therefore, due process is violated by jury instructions which use mandatory

4  presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

5  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

6  (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

7  fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

8  permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

9  from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

10  (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

11  instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

12  by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

13  re Winship, 397 U.S. at 364).  Finally, even if constitutional error is found, habeas relief is not

14  warranted if the error was harmless.  See Ho v. Carey, 332 F.3d 587, 592 (9th Cir. 2003).

15    In addressing this claim, the state court began with the general principles of law

16  concerning aiding and abetting.  The court explained that, under California law, if a defendant's

17  liability is predicated on a theory of aiding and abetting, the defendant's intent to encourage or

18  facilitate must be formed prior to or during the commission of the offense.  The court added:

19      . . . Because the commission of robbery does not end until the loot has
   been carried away to a place of temporary safety, a getaway driver who
20  joins the crime after the property has been taken but before it reaches a
   place of safety is guilty of aiding and abetting the robbery. (citation
21  omitted).  [¶]  However, late-joiners to a criminal enterprise are not guilty
   of aiding and abetting crimes committed before they joined.  (citation
22  omitted).  For example, a participant in a robbery is not an aider and
   abettor of a homicide committed before he became an accomplice.
23  (citation omitted).

24  ///

25  ///

26  ///

As to petitioner's assertion that the prosecutor presented a possible theory that he did not join the criminal enterprise until co-defendant John-Charles got into the car with the stolen property, the state court disagreed:

> . . . The prosecutor did not argue defendant's involvement could have begun only at the point in time when John-Charles entered defendant's car. Rather, the prosecutor argues defendant participated in the crime from its beginning as a co-principal and co-conspirator, and either as an active participant inside the house or as the getaway driver waiting outside the entire time.
>
> Defendant points us to the prosecutor's closing argument, where she acknowledged defendant's role may have been the getaway driver and he may not have entered the house, to claim the prosecutor argued defendant was a late-joiner to the crime. The mere fact the prosecutor said the defendant could still be convicted even if he served as the getaway driver and did not go inside the house did not equate with a theory the defendant did not join the criminal activity until after his co-defendant got into his car.
>
> * * *
>
> Moreover, defendant himself did not argue he was innocent of robbing Bluster and assaulting Johnson because we has a late-joiner to those crimes. Defendant simply denied committing any of the charges offenses, and argued the prosecution had not proven each element of each crime. He even argues he did not serve as the getaway driver.

The state court concluded that, because "the issue of when defendant formed the intent to aid and abet the robbery was not even remotely an issue 'commonly or closely and openly connected to the facts before the court . . .' (citation omitted). The court thus was under no obligation to instruct sua sponte on the timing element of aiding and abetting.

The basis for petitioner's claim of instructional error is the mistaken assessment of the record that the prosecutor argued that petitioner was a late joiner. Under petitioner's logic, if he did not join the criminal enterprise until after John-Charles got into his car with the stolen property, the jury should have been instructed on the timing element of aiding and abetting. As the state court observed, petitioner's interpretation of the record is not accurate. Moreover, even if petitioner merely sat in his car while the others committed the crimes, his participation by driving the car from the scene of the crime would still make him guilty of aiding

11

1    and abetting.  Under California law the crime of robbery is not complete until the items stolen

2    reach safety.  Petitioner clearly participated in the crime before the stolen property reached

3    safety by driving the car intended to take the property to safety.  Thus, the crime of robbery had

4    not been completed before petitioner's involvement and, for this reason, no timing instruction on

5    late joiners was required.

6           **B.    Prosecutorial Misconduct (Claim 3)**

7                  Petitioner claims that the prosecutor committed misconduct through her comment

8    during closing arguments on the lack of fingerprint evidence.  Respondent argues that this claim

9    is procedurally barred and that it lacks merit.

10                 In addition to addressing the merits of this claim, the state court concluded that

11   petitioner had defaulted on the claim by not making a contemporaneous objection to the alleged

12   misconduct at the time of trial.  Based on concerns of comity and federalism, federal courts will

13   not review a habeas petitioner's claims if the state court decision denying relief rests on a state

14   law ground that is independent of federal law and adequate to support the judgment.  See

15   Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989).

16   Generally, the only state law grounds meeting these requirements are state procedural rules.

17   Even if there is an independent and adequate state ground for the decision, the federal court may

18   still consider the claim if the petitioner can demonstrate:  (1) cause for the default and actual

19   prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of

20   justice.  See Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

21                 In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999), and Van Sickel v.

22   White, 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous

23   objection rule is an adequate and independent state procedural rule when properly invoked by the

24   state courts.  The Ninth Circuit has also concluded that the contemporaneous objection rule has

25   been consistently applied by the California courts.  See Melendez v. Pliler, 288 F.3d 1120, 1125

26   (9th Cir. 2002).

1    Here, the contemporaneous objection rule was properly invoked by the California

2    Court of Appeal and the Ninth Circuit has concluded that the rule is adequate, independent, and

3    consistently applied.  Because petitioner has not demonstrated cause and prejudice, the court

4    agrees with respondent that this claim is procedurally barred.[3]

5    Even if the procedural bar did not apply, the claim lacks merit.  Concerning the

6    allegedly improper statements, the following exchange took place at trial:

7    PROSECUTOR:    Then, Your Honor, I would ask the Court to
     address the issue, because I think I have a right to respond to the
8    representations that [defense counsel] made in front of the jury about the
     lack of fingerprints [on the money].

9

     THE COURT:    Well, you do.  [¶] The Court did consider
10   the issue of the [fingerprints on the] money and I presented certain options
     to counsel.  And it was decided to proceed with the trial and so that's what
11   we did.

12   PROSECUTOR:    [To the jury]: So you don't have that
     evidence before you, you don't have it before you for a reason.

13

14   According to petitioner, the underlying dispute concerning the fingerprints arose because the

15   money was never fingerprint tested due to police error.  Petitioner states that the effect of the

16   above exchange was to make defense counsel appear deceptive by suggesting that defense

17   counsel was the "reason" the jury did not have fingerprint evidence.

18   Success on a claim of prosecutorial misconduct requires a showing that the

19   conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

20   process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to

21   determine "whether, considered in the context of the entire trial, that conduct appears likely to

22   have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

23

24       [3]    Respondent raises the procedural bar argument in his answer to the petition.
     Petitioner's traverse, in which he could have raised cause and prejudice, was stricken because it
25   was not accompanied by a proof of service on respondent.  This order was issued in September
     2005 and petitioner has not re-submitted his traverse or otherwise sought to argue cause and
26   prejudice concerning his procedural default in state court.

13

1   Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

2   determined, such error is considered harmless if the court, after reviewing the entire trial record,

3   concludes that the alleged error did not have a "substantial and injurious effect or influence in

4   determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

5   deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

6   substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).  Depending on

7   the case, a prompt and effective admonishment of counsel or curative instruction from the trial

8   judge may effectively "neutralize the damage" from the prosecutor's error.  United States v.

9   Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

10          As to the merits of petitioner's claim of prosecutorial misconduct, the state court

11  held:

12                  Even were we to find the issue had not been waived, we would
                find no misconduct and therefore no prejudice.  "Ultimately, the test for
13          misconduct is whether the prosecutor has employed deceptive or
            reprehensible methods to persuade either the court or the jury."  (citation
14          omitted).  The prosecution's attempt to neutralize defense counsel's clear
            inference the fingerprint evidence was not introduced solely because of
15          the prosecution's actions was neither deceptive nor reprehensible.

16  The basis for the state court's conclusion is that the "reason" the fingerprint evidence was not

17  before the jury was because the trial judge gave the parties options concerning the issue and an

18  option was selected to proceed to trial without the fingerprint evidence.  This is consistent with

19  the exchange that took place in front of the jury.  It is clear that the "reason" referred to by the

20  prosecutor was the choice outlined by the judge, and not due to any deception on the part of

21  defense counsel, as petitioner urges.  On this record, the court cannot say that the state court's

22  determination of this claim was either contrary to or an unreasonable application of controlling

23  federal law.

24  ///

25  ///

26  ///

1    **C.    Substitution of Counsel (Claim 4)**

2    As summarized by the state court:

3            Defendant alleges the trial court erred in refusing to inquire further
         into his grounds for seeking substitute counsel to bring a motion for a new
4        trial on the basis his trial counsel provided ineffective legal assistance.

5    "A State has a duty to provide an indigent defendant with effective assistance of

6    counsel through his first appeal." Hendricks v. Zenon, 993 F.2d 664, 669 (9th Cir. 1993) (citing

7    Douglas v. California, 372 U.S. 353, 358 (1963)).  In California, a criminal defendant who is

8    dissatisfied with court-appointed counsel must be permitted to state the reasons why the

9    defendant believes the attorney should be replaced.  See Marsden, 2 Cal. 3d at 123-24.  When a

10   defendant seeks to discharge counsel and substitute another attorney on the ground of inadequate

11   representation, the court is required to allow the defendant to explain the basis for the motion

12   and relate specific instances of the attorney's deficient performance.  See id.  Denial of a

13   Marsden motion can only amount to a constitutional violation where there was a conflict

14   between the defendant and counsel which prevented effective representation.  See Schell v.

15   Witek, 218 F.3d 1017, 1026 (9th cir. 2000) (en banc).

16           At the outset, the court finds that this claim, as articulated by petitioner, is not

17   cognizable on federal habeas review because it asserts an error of state law.  In particular,

18   petitioner contends that the trial court did not completely exercise its duty to inquire as to the

19   reasons behind petitioner's Mardsen motion.  This is a question of state law and the state court

20   found no error because the trial judge had given petitioner an opportunity to explain in open

21   court why he wanted substitute counsel.  A writ of habeas corpus is available under 28 U.S.C.

22   § 2254 only on the basis of a transgression of federal law binding on the state courts.  See

23   Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195,

24   1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of

25   state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir.

26   1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be

1  utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

2          To the extent petitioner raises a cognizable federal habeas claim, however, the

3  court concludes that there is nothing in the record to establish a conflict between petitioner and

4  counsel which prevented effective representation.

5          **D.      Cruel and Unusual Punishment (Claim 5)**

6          Petitioner claims that his sentence of 82 years to life constitutes cruel and unusual

7  punishment, in violation of the Eighth Amendment.  This claims was raised for the first time on

8  direct appeal.  The state court concluded that petitioner had waived the claim by not making a

9  contemporaneous objection to the sentence.  See People v. Norman, 109 Cal.App.4th 221, 229

10 (2003).  Respondent argues that, because petitioner procedurally defaulted this claim by not

11 making a contemporaneous objection, and because the state court invoked the procedural default

12 to deny the claim on direct appeal, this court is barred from reviewing the state court's denial of

13 the claim.  The court agrees.  As discussed above, the contemporaneous objection rule is

14 independent, adequate, and consistently applied.  Because petitioner has demonstrated neither

15 cause nor prejudice, this court is barred from granting relief on the claim.

16         **E.      Abuse of Discretion (Claims 6 and 7)**

17         Petitioner asserts that the trial court abused its discretion.  In claim 6, petitioner

18 contends that the trial court abused its discretion by failing to strike a prior felony conviction for

19 sentencing enhancement purposes.  In claim 7, petitioner argues that the trial court abused its

20 discretion by sentencing him to consecutive sentences on all counts.  As discussed below, this

21 court cannot grant relief on either claim.

22                 1.      Refusal to Strike Prior Felony Conviction

23         Petitioner claims that the trial court erred in its application of California Penal

24 Code § 1385, which governs consideration of motions to strike prior convictions.  Petitioner's

25 argument relies entirely on state law and, as such, the claim is not cognizable in this case.

26 ///

2.   <u>Consecutive Sentences</u>

The essence of claim 7 is that the trial court abused its discretion in sentencing petitioner to consecutive sentences.  The state court invoked the contemporaneous objection default to deny this claim because petitioner had not raised an objection at the time of sentencing.  Respondent argues that this court is procedurally barred from reviewing the state court's denial of this claim.  Again, because the default was properly applied by the state court and because petitioner has asserted neither cause nor prejudice, the court must agree.

**F.   <u>Ineffective Assistance of Counsel (Claims 2 and 8)</u>**

In claim 2, petitioner contends that his trial counsel was ineffective because he failed to request the aiding and abetting jury instruction he argues in claim 1; and the trial court erred by not giving it sua sponte.  In claim 8, petitioner argues that trial counsel was ineffective for failing to raise contemporaneous objections at sentencing.

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  <u>See</u> <u>id.</u> at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  <u>See</u> <u>id.</u> at 690.  The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  <u>See</u> <u>id.</u>  In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S. at 689).

/ / /

/ / /

17

Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

As to each of petitioner's claims of ineffective assistance of counsel, the court finds that petitioner cannot prevail.

### 1.   Failure to Request Aiding and Abetting Jury Instruction

This claim is related to claim 1 in which petitioner argues instructional error because the trial court failed to sua sponte instruct the jury on the timing element of aiding and abetting for late joiners to the criminal enterprise.  Here, petitioner argues that his trial counsel was ineffective for failing to request such an instruction.  As discussed above, the court finds that no timing instruction was required or even suggested on the facts of this case.  Therefore, counsel's performance was not deficient for failing to request the instruction.

### 2.   Failure to Raise Contemporaneous Objections

Petitioner argues that his trial counsel was ineffective because he did not raise contemporaneous objections regarding:  (a) consecutive sentences; (b) cruel and unusual punishment; and (c) the prior felony conviction.[4]  It follows that, as to each of these asserted bases

---

[4]     Petitioner does not argue that counsel was ineffective for failing to raise a contemporaneous objection regarding the prosecutorial misconduct issue.  In any event, as discussed above, that claim lacks merit.  Therefore, counsel could not have been deficient for

1  of ineffective assistance, if such objections would have had no merit to begin with, then counsel

2  could not have been deficient for failing to raise them and, likewise, petitioner could have

3  suffered no prejudice.  Therefore, the court will examine the merits of each of these claims.

4  <u>Cruel and Unusual Punishment</u>

5  In non-capital cases, a sentence of a term of years will not be disturbed as violating

6  the Eighth Amendment prohibition on cruel and unusual punishment except in rare cases where

7  the sentence is grossly disproportionate to the offense.  <u>See</u> <u>Ewing v. California</u>, 538 U.S. 11

8  (2003).  Under this principle, the Supreme Court recognizes that repeat offenders, particularly

9  those who repeatedly commit violent crimes, may be treated more harshly under statutory

10  schemes intended to deal with recidivism.  <u>See</u> <u>id.</u>

11  In this case, petitioner was convicted of two counts of home-invasion robbery and

12  one count of assault with a deadly weapon.  Petitioner's record reflects a prior conviction as an

13  adult for attempted home-invasion robbery and residential burglary.  This prior incident resulted

14  in a shooting death.  In addition, petitioner's juvenile record demonstrates  that he became a ward

15  of the court in 1990 following conviction for felony assault with a deadly weapon.  Petitioner also

16  escaped from juvenile custody and evaded arrest on several occasions.  In 1994 petitioner was

17  convicted of misdemeanor possession of marijuana.  And, just a few months before his 18th

18  birthday, petitioner was convicted of battery after he hit his girlfriend in the face with his fist and

19  then kicked her several times.

20  Given this criminal history, the court cannot say that the current sentence is

21  grossly disproportionate.  Not only were the offenses giving rise to the current sentence extremely

22  violent and involved a deadly weapon, but petitioner has a history of repeating this kind of

23  conduct since he was a juvenile.  Because an objection to the sentence based on the theory that it

24  constitutes cruel and unusual punishment would not have had merit, counsel was not deficient for

25

26  failing to raise a contemporaneous objection, nor could petitioner have been prejudiced.

1  failing to raise such an objection and petitioner was not prejudiced.

2           Prior Felony Conviction

3           Under California's Three Strikes law, which imposes harsher punishment on

4  certain repeat offenders, when determining whether to strike a prior conviction, the trial court

5  must consider "whether, in light of the nature and circumstances of his present felonies and prior

6  serious and/or violent felony convictions, and the particulars of his background, character, and

7  prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and

8  hence should be treated as though he had not previously been convicted of one or more serious

9  and/or violent felonies." People v. Williams, 17 Cal.4th 148, 161 (1998).  As to the merits of this

10  claim under state law, the California Court of Appeal reviewed for abuse of discretion and

11  concluded:

12                 Here, the record demonstrates the trial court did not abuse its
        discretion.  Following argument on the matter, the court based its
13        determination on the current case, defendant's prior record, and his
        background and concluded defendant met the spirit of the Three Strikes
14        law: ". . . [defendant] has an abysmal record.  It's true, his only conviction
        as an adult was the a [sic] 211 and the 459, but if I read his age and the
15        history appropriately, he had just turned 18.[5]

16  The court then recited petitioner's history, which includes a number of instances of escape from

17  juvenile facilities, resisting arrest, vehicle theft, and drug offenses.  On this record, the court does

18  not disagree with the state court's assessment that petitioner fell within the spirit of the Three

19  Strikes law.  Given petitioner's record, any objection regarding the prior would have been futile.

20  Therefore counsel was not deficient for failing to make such an objection and petitioner was not

21  prejudiced.

22  ///

23  ///

24  _____
       [5]       The adult conviction was based on petitioner's participation in 1996 in a home
25  invasion robbery which resulted in the shooting death of at least one person.  Petitioner was
    convicted of attempted first degree robbery and first degree burglary.  While on parole from this
26  conviction, petitioner committed the current offenses.

<u>Consecutive Sentences</u>

As the state court observed, petitioner concedes that it was within the trial court's discretion to impose consecutive sentences.  Therefore, to raise a successful objection, counsel would have had to convince the trial judge that imposition of consecutive sentences constituted an abuse of discretion.   As discussed above, the trial court properly found that petitioner's offense and history place him within the spirit of the Three Strikes law.  Further, as also discussed above, the sentence is not grossly disproportionate.  Because petitioner may properly be treated more harshly as a repeat violent offender, the court cannot see how it could have been an abuse of discretion to impose consecutive sentences.  Therefore, counsel was not deficient and petitioner was not prejudice due to failure to object to consecutive sentences.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  May 30, 2007.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

21